UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Margaret H. Walker,
        Plaintiff

                                        Case No. 19-cv-1149-SM
        v.                              Opinion No. 2021 DNH 170

School Administrative Unit Sixteen,
David Ryan, Ed. D., Superintendent,
and Patricia Wons, Principal,
        Defendants

<u>**O R D E R**</u>

Margaret Walker filed this employment discrimination action
against School Administrative Unit 16 ("SAU 16"), its
superintendent, David Ryan, Ed. D., and Patricia Wons, the
principal of Exeter Region Cooperative Middle School ("CMS"),
where Walker worked as a Student Assistance Counselor for
several years.  She alleges that she was the victim of unlawful
age discrimination, and asserts claims for violation of the
federal Age Discrimination in Employment Act ("ADEA") and New
Hampshire's Law Against Discrimination.  Defendants have moved
for summary judgment on all of Walker's claims.  Walker objects.

**Standard of Review**

When ruling on a motion for summary judgment, the court is
"obliged to review the record in the light most favorable to the
nonmoving party, and to draw all reasonable inferences in the
nonmoving party's favor."  <u>Block Island Fishing, Inc. v. Rogers</u>,

844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary
judgment is appropriate when the record reveals "no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this
context, a factual dispute "is 'genuine' if the evidence of
record permits a rational factfinder to resolve it in favor of
either party, and 'material' if its existence or nonexistence
has the potential to change the outcome of the suit."  Rando v.
Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).
Consequently, "[a]s to issues on which the party opposing
summary judgment would bear the burden of proof at trial, that
party may not simply rely on the absence of evidence but,
rather, must point to definite and competent evidence showing
the existence of a genuine issue of material fact."  Perez v.
Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014).  In other
words, "a laundry list of possibilities and hypotheticals" and
"[s]peculation about mere possibilities, without more, is not
enough to stave off summary judgment."  Tobin v. Fed. Express
Corp., 775 F.3d 448, 451–52 (1st Cir. 2014).  See generally
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

### Factual Background

New Hampshire School Administrative Unit 16 is comprised of
seven different school districts, including the Exeter Region
Cooperative School District.  CMS is part of the Exeter Region

Cooperative School District.  Dr. Ryan became superintendent of SAU 16 on July 1, 2018.  He reports to the joint board of SAU 16, which includes board members from each of the seven districts.  As mentioned, Wons serves as the principal of CMS.

Walker is a Licensed Drug and Alcohol Counselor, with a bachelor's degree in social work.[1]  At the time of the events giving rise to this action, she was 61 years old.  Walker began working at CMS in July, 2000, when she was hired as a contracted employee through a New Hampshire Department of Education three-year grant program.  When the grant expired, Walker became a contract employee of the Exeter Region Cooperative School District.  The most recent version of her employment agreement was effective from July 1, 2018 to June 30, 2019, and was executed by Walker on May 18, 2018.  The terms of Walker's 2018-2019 employment agreement were essentially identical to those of her previous employment agreements with the school district. The agreement included the following language: "Each party reserves the right to terminate this agreement, without liability, following a thirty-day written notice."  Pl.'s Opp. to Summary Judgment, Exh. 3.

---

[1]    Walker also received a master's degree in Criminal Justice, with a focus on juveniles.

As a Student Assistance Counselor at CMS, Walker was responsible for developing and facilitating the middle school's Student Assistance Program, including drug and alcohol prevention and intervention services, counseling, family meetings, and community outreach.  As an LADC, Walker was subject to certain confidentiality requirements, and so was limited in her ability to discuss some issues concerning students with their families or the administration.

Between 2005 and 2008, Walker held a "Beginning Educator Certificate" for school social work issued by the New Hampshire Department of Education.  She obtained the certificate because she hoped to be included as part of the collective bargaining unit representing teachers in the school district (the Exeter Education Association).  The teacher's union, however, advised Walker that her position was not included in the bargaining unit certification (since the position of School Assistance Counselor did not require certification by the New Hampshire Department of Education[2]).  Because she was not required by the school district to maintain the certificate, she allowed it to lapse.  The certification was renewable, however, and Walker says she could

---

[2]    Walker was considered "noncertified personnel," which meant that her position was at-will and did not require NH DOH certification or credentialing.  Because she was noncertified personnel, SAU's superintendent was authorized to terminate her position without consulting the school board.  To fire "certified personnel," the superintendent was required to obtain the school board's approval.

easily become recertified, which would permit her to act as a school social worker on a "grandfathered" basis.

Dr. Ryan began his term as Superintendent of SAU 16 in July, 2018.  Plans were already in the works to replace the CMS Student Assistance Counselor position held by Walker with a certified school social worker position when Ryan started.  See Pl.'s Opp. to Summary Judgment, Exh. 9, Ryan Dep. at 46:10-22 ("it was relayed to me [when I started]. . . that moving to a model of a certified school social worker was probably our next step.  And the existence of the student assistance counsellor would be transformed or eliminated . . . and replaced with the certified school social worker position.  So knowing that we were working within a budget and needing to eliminate a position to add a position, the student assistance counsellor position had been looked at for that even prior to my arrival.").  Soon after he assumed the Superintendent's position, and after consulting with Associate Superintendent Ester Asbell (who, at that time, oversaw Guidance and Counseling for the SAU), Ryan decided that "the needs of the student body at the Cooperative Middle School would be better met by employing a licensed social worker than a student assistance counselor."  Defs.' Mot. for Summary Judgment Exh. 5, Ryan Dep. 73:17-22.  As Dr. Ryan explained:

A licensed alcohol and drug addiction counselor works
with students on areas of addiction, whether they be
alcohol addiction, drug addiction, nicotine, other
addictions, or addictions that exist within families,
and counsels and works from a therapeutic perspective
for students and gives them the opportunity to share
highly confidential information.

LADCs and student assistance counsellors are bound to
confidentially with those students.  Even if parents
inquire about what was discussed, . . . the original
contract that the state had with student assistant
counselors and LADCs[] prohibits the counsellors from
sharing confidential information with families, as well
as administrators, regarding any of the work they're
doing with the children in those sessions.

A school social worker we saw as – first of all, it's a
certified position under the New Hampshire Department
of Education, and it really opens up opportunities to
get into homes and create more opportunities for family
therapeutic practices to take place.  They are not
necessarily bound to that same level of
confidentiality.  And, given the population that we
serve in SAU 16, we believed that at the middle school
level, that type of work really needed to – to take
place.

Pl.'s Opp. to Summary Judgment, Exh. 9, Ryan Dep. at 48:2-49:8.


Initially, Dr. Ryan intended to not renew Walker's contract

at the end of the 2018-2019 school year, and to advertise and

hire a school social worker for the 2019-2020 school year.  But,

in September, 2018, Wons, Asbell and Ryan met; they discussed

Walker's performance.  During that meeting, Wons noted that

Walker had certain "boundary issues," and had been working

against the administration's implementation of particular

projects and initiatives.  Wons described two specific

incidents.  The first was a disagreement between Wons and Walker

regarding whether a crisis meeting ought to be held following an incident at the middle school, with Walker, as Ryan put it, "creating a stir among [the faculty]."  Defs.' Motion for Summary Judgment, Exh. 5, Ryan Dep. 37:17-20.  The second incident related to Walker's placement of "an article that upset a lot of teachers and staff in the building . . . that [was] denouncing the current practices that we were implementing" in teachers' mailboxes.  Defs.' Mot. for Summary Judgment, Exh. 7, Wons Dep. 60:3:7.

Asbell had expressed similar concerns regarding Walker's boundary issues to Dr. Ryan earlier that summer.  See Defs.' Mot. for Summary Judgment, Exh 5, Ryan Dep. 51:9-12 ("[Asbell's concerns] were very similar to the examples that were shared by Ms. Wons; just some general summaries of Ms. Walker's pushback on administration.")  See also id. at 45:7-17 ("I think the majority of the information I received, and not in any specific detail, but relative to poor boundary issues was from Associate Superintendent Esther Asbell, who had worked in the district for several years and had expressed some – not really examples, but just overall summaries of Ms. Walker's performance related to boundaries, which were really the – that was an area that we felt needed to be addressed and, quite frankly, was something that I looked at when we made the decision to terminate early").

Based on Wons's and Asbell's feedback, Ryan made the decision to execute the termination provision in Walker's contract instead of letting it run its term and not renew it. He also decided to eliminate the Student Assistance Counselor position, and accelerate the hiring of a certified school social worker.  Accordingly, on October 4, Ryan informed Dr. Thomas Campbell, the SAU's Superintendent for Human Resources, that he intended to terminate Walker's employment contract, and that he wanted to hire a certified school social worker for CMS.  See Defs.' Mot. for Summary Judgment, Exh. 6, Campbell Dep. at 31:7-12.  Ryan asked Campbell to join him when he met with Walker the following day to inform her of his decision.

On October 5, Ryan and Campbell met with Walker.  Ryan handed Walker a letter giving her notice that the district was exercising its option to terminate the employment agreement. Defs.' Mot. for Summary Judgment, Exh. 2, Walker Dep. at 39:15-40:22; 60:20-22; Defs.' Mot. for Summary Judgment, Exh. 5, Ryan Dep. at 58:5-10; 59:8-17; Defs.' Mot. for Summary Judgment, Exh. 6, Campbell Dep. at 20:5-13; 21:14-22:2.  The letter noted that Walker's last day would be November 4, 2018, but that she was being relieved of her duties immediately.  See Pl.'s Opp. to Summary Judgment, Exh. 8.  Walker asked several times why she was being terminated, but Dr. Ryan responded only that he was "executing the terms in the agreement".  Defs.' Mot. for Summary

Judgment, Exh. 2, Walker Dep. at 61:2-7; Defs.' Mot. for Summary

Judgment, Exh. 5, Ryan Dep. at 39:7-12; 59:7-12.

On October 12, Won emailed a letter to CMS families.  See

Pl.'s Opp. to Summary Judgment, Exh. 10.  That letter, drafted

by Wons and Ryan, announced Walker's departure, thanked her for

her years of service, and wished her well.  The letter then

stated:

> [W]e have come to understand that we must begin
> addressing the needs of our students in a more
> contemporary fashion.  In pursuing more purposeful
> opportunities to improve our development of students'
> social and emotional wellness, we have begun drafting
> a job description and search process to satisfy the
> addition of a certified school social worker.  This
> position will be deployed to assess the current level
> of trauma-related issues our students may be
> experiencing and subsequently seek to identify
> solutions.  We believe that by centering a qualified
> professional on issues related to child trauma,
> whether that trauma is related to familial or personal
> substance abuse, physical abuse, sexual abuse, or any
> combination of other indicators of trauma, our
> students will be best served.  While all of our school
> counselors valiantly work with students through these
> types of issues, a qualified school social worker is
> uniquely trained to lead team efforts in addressing
> more broad issues as well as connect students and
> families to a more expansive range of services.

Id.  Walker saw the letter shortly after it was sent, and

construed the word "contemporary" as a reference to her age.

She stated, "I believe it implies that what I was supplying

[students] was old-fashioned, outdated, and I think it was a

reference to how long I'd been around, what my age was."  Pl.'s
Opp. to Summary Judgment, Exh. 2, Walker Dep. 43:10-13.

Wons, Asbell, and Jamie Sawler, the school district's
Director of Counseling, drafted a job description for the new
school social worker position, which was posted at the end of
October.  The position required a master's degree in social work
(an "MSW"); that the candidate be a state licensed social
worker; and be certified by the New Hampshire Department of
Education as a school social worker.  Walker did not apply for
the position (she may have been qualified to perform as a school
social worker if she renewed her certificate, but did not hold
an MSW degree).

Several candidates were interviewed for the position.  On
February 7, 2019, the Exeter School Board approved Ryan's
nomination of Morgan Quealy (Seney) to fill the new position.
Quealy was 29 years old when she was offered the position.  She
had earned an MSW; was licensed as an Independent Clinical
Social Worker ("LICSW") by the Commonwealth of Massachusetts;
had four years' experience working as a school-based clinician
at a Boston public school; and, she had an alternative
certification plan with the New Hampshire Department of
Education and was working towards that full credential.

**DISCUSSION**

1.   ADEA Claim

"The ADEA makes it unlawful for an employer to 'discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc., 999 F.3d 37, 50 (1st Cir. 2021) (quoting 29 U.S.C. § 623(a)(1)). "In an ADEA wrongful discharge case, the plaintiff bears the burden of proving by a preponderance of the evidence that his age was the 'determinative factor in his discharge, that is, that he would not have been fired but for his age.'" Id. (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1335 (1st Cir. 1988)) (further citations omitted). As the Court of Appeals for the First Circuit noted recently:

> A plaintiff may use either direct or circumstantial evidence to prove [her] ADEA claim. See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009); Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 24 (1st Cir. 1998). If the plaintiff "provides direct evidence of discrimination, the issue may be put to a finder of fact without further ado." Alvarez-Fonseca, 152 F.3d at 24. If the plaintiff, however, does not provide direct evidence of discrimination, we apply the familiar burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), which has been adopted for ADEA cases, Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995). Under the McDonnell Douglas framework, a plaintiff who was terminated as part of a reduction in force has the initial burden of establishing a prima facie case by showing that: (i) [she] was at least forty years old

11

at the time of his termination; (ii) [she] was meeting
the employer's legitimate performance expectations;
(iii) [she] was terminated from [her] employment; and
(iv) "the employer did not treat age neutrally or that
younger persons were retained in the same position."
LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st
Cir. 1993) (quoting Hebert v. Mohawk Rubber Co., 872
F.2d 1104, 1111 (1st Cir. 1989)).  "This burden is not
onerous."  Caraballo-Caraballo v. Corr. Admin., 892
F.3d 53, 57 (1st Cir. 2018).

If the plaintiff establishes [her] prima facie case,
"the burden of production -- but not the burden of
persuasion -- shifts to [the employer], who must
articulate a legitimate, non-discriminatory reason"
for its action.  Theidon v. Harvard Univ., 948 F.3d
477, 495 (1st Cir. 2020) (quoting Johnson v. Univ. of
P.R., 714 F.3d 48, 53-54 (1st Cir. 2013)); see also
McDonnell Douglas Corp., 411 U.S. at 802.  If the
employer articulates such a reason, the burden shifts
back to the plaintiff, who must then show, by a
preponderance of the evidence, that the employer's
proffered reason for the adverse employment action was
pretextual, and "that age was the 'but-for' cause of
the employer's adverse action."  Vélez v. Thermo King
de P.R., 585 F.3d 441, 447-48 (1st Cir. 2009).

Zampierollo-Rheinfeldt, 999 F.3d 37 at 50-51.


Plaintiff says that she has shown "direct evidence of age

bias," pl.'s mem. in opp. at 6, but does not specify the

evidence in the record to which she is referring.  Because the

court discerns no direct evidence of discrimination, the

McDonnell-Douglas burden-shifting framework applies.


A.   Prima Facie Case

Defendants do not seriously challenge that Walker meets the

first three prongs of the prima facie test: she was in her early

60s; the evidence of record shows that her performance reviews were positive; and her employment was terminated.  Defendants argue that plaintiff founders on the fourth prong: she has not demonstrated that defendants "did not treat age neutrally or that younger persons were retained in the same position." LeBlanc, 6 F.3d at 842.  Defendants say the school district eliminated Walker's position (the student assistance counselor position), and created an entirely new position, that of certified school social worker.  That new position required different licensing, credentials, and level of education. Walker responds that the job responsibilities for the positions were largely the same, and that the certified school social worker position required credentials that were substantially similar to those Walker held, or could easily obtain (by renewing her certificate, not by obtaining an MSW degree).

Plaintiff's burden to make out a prima facie case is "not onerous."  Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 719 (1st Cir. 1994) (quotations omitted).  Still, Walker is "required to prove the prima facie elements by a preponderance of the evidence."  Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc., 804 F.3d 127, 131 (1st Cir. 2015) (quotation omitted).  The record discloses that the school social worker and student assistance counselor positions did not have "roughly equivalent occupational qualifications, thereby demonstrating a

continuing need for the same services and skills," <u>Sanchez</u>, 37
F.3d at 719, but certainly some services (counseling students)
were necessarily overlapping between the new and the old.

The two positions certainly shared some responsibilities,
yet were qualitatively and markedly different.  To be sure, a
student assistance counselor and a school social worker would be
expected to perform guidance and counseling responsibilities, to
collaborate with students, parents, faculty, and community
members, and provide crisis support.  And, both positions were
expected to assist students "with social, emotional and behavior
problems that interfere with academic achievement."  Pl's. Opp.
to Summary Judgment, Exh. 14 at 1, and 3.  That the two jobs
shared similar responsibilities at some levels, however, is not
dispositive.  <u>See</u> <u>Weston-Smith v. Cooley Dickinson Hosp., Inc.</u>,
153 F. Supp. 2d 62, 72 (D. Mass. 2001) (terminated employee
failed to establish discriminatory intent where newly created
position subsumed many of the employee's responsibilities, but
also included significant additional responsibilities).

The requisite qualifications and credentials for the
respective positions were substantially different.  The school
social worker position required an MSW, a degree that Walker
plainly did not have.  Walker's argument that she was qualified
for the District's school social worker position, despite not

having an MSW, is misplaced.  She argues that her expired

"Beginning Educator Certificate is a full educator certificate,"

pl.'s mem. in opp. at 5, and notes that had she renewed that

certification, she could have performed as a school social

worker because the New Hampshire Department of Education

"grandfathered" certified school counselors when it added an MSW

requirement for certification as a school social worker.  She

further argues that she "would have been able to come into

compliance with the [NH] Department of Education requirements to

be a school social worker," id., at 6, by renewing her

certificate (and, presumably, applying for the new position).

Whether Walker could have come into compliance with the State's

requirements by renewing her certificate is somewhat beside the

point,[3] and not just because she did not renew and did not apply

for the new position.  It was the District's prerogative to set

legitimate educational requirements for its school social worker

position, and the District was permitted to set those

---

[3]     The parties dispute whether, in 2018, the State required
certified school social workers to hold an MSW.  But, whether
the State required an MSW does not matter for purposes of
determining whether defendants discriminated against Walker
because of her age.  Even assuming that the NH DOE did not
require an MSW in 2018, the District was well within its
discretion to set the position's qualifications above those
minimum requirements mandated by the State.

requirements higher than those imposed by state law (as long as those requirements were not discriminatory[4]).

Defendants' contention that plaintiff has not sufficiently established a prima facie case is fairly convincing.  See, e.g., Dougherty v. Blue Cross Blue Shield of Mass., Inc., 966 F. Supp. 80, 87 (D. Mass. 1996)) (plaintiff failed to set forth a prima facie case where defendant established that other employees were reassigned to perform her duties, and purported "replacements" did not have "roughly equivalent job qualifications").  Nevertheless, given Walker's light burden, the court will assume that Walker has established a prima facie case, and continue to the next step of the analysis.

> B.   Pretext and Discriminatory Animus

Once plaintiff has established a prima facie case, the burden "switches to the employer to articulate a legitimate nondiscriminatory reason for the challenged action."  Sanchez, 37 F.3d at 720.  "This is a burden of production, not of persuasion; the employer merely must 'set forth, through the introduction of admissible evidence, reasons for its action which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment

---

[4]     Walker does not argue that the educational requirement was pretextual.

action.'"  Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S.
502, 507 (1993)) (further citations omitted).  Defendants say
that Walker's position was eliminated because the District
wanted to hire a certified school social worker to better meet
CMS student needs, and has provided evidence in support in the
form of deposition testimony from Dr. Ryan.

     Defendants having proffered a legitimate non-discriminatory
reason, the burden shifts back to Walker to "offer some
minimally sufficient evidence, direct or indirect, both of
pretext and of the employer's discriminatory animus to prevail
in the face of a properly drawn" summary judgment motion.
Mesnick v. General Electric Co., 950 F.2d 816, 825 (1st Cir.
1991).  "It is not enough for a plaintiff merely to impugn the
veracity of the employer's justification; [she] must 'elucidate
specific facts which would enable a jury to find that the reason
given is not only a sham, but a sham intended to cover up the
employer's real motive: age discrimination.'"  Mesnick, 950 F.2d
at 824 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896
F.2d 5, 9 (1st Cir. 1990)).

     Walker argues that pretext should be inferred here because
defendants have given "inconsistent" reasons for Walker's
termination.  And, as Walker correctly states, inconsistent
explanations can give rise to an inference of pretext.  See

Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 662–
63 (1st Cir. 2010) ("Pretext can be shown by such weaknesses,
implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons
for its action that a reasonable factfinder could rationally
find them unworthy of credence and hence infer that the employer
did not act for the asserted non-discriminatory reasons.")
(quotations omitted).

The evidentiary record on summary judgment, however, does
not support her argument.  The undisputed evidence establishes
that Ryan fully intended to eliminate Walker's position at the
end of the 2018-2019 school year, because he concluded that a
licensed school social worker would better meet the needs of CMS
students.  In September, 2018, when Wons brought personnel
issues involving Walker to Ryan's attention, Ryan accelerated
that plan to eliminate the position.  Ryan did not explain his
reasoning to Walker when he met with her on October 3, but,
after that meeting he asked Wons for a written summary of the
personnel issues that led to terminating Walker's contract and
accelerating the hiring of a licensed social worker.

The "inconsistencies" that plaintiff identifies either are
not actually inconsistencies, or they are misunderstandings of
the record.  For example, Walker relies heavily upon the fact

that Ryan asked Wons for a written summary of the personnel
issues related to Walker following the meeting on October 3.
She insists that Ryan's request "tends to raise a question of
fact as to the truth of the reasons given by the Defendants for
Walker's dismissal."  Pl.'s Mem. in Opp. at 11.  But she does
not explain why Ryan's request was suspicious, nor does she
offer any legal support for that argument.  Walker further
relies upon the fact that the October, 2018, letter to CMS
parents did not specify that the new position would require an
MSW.  But, that letter was intended to notify parents that
Walker would no longer be working at CMS, and that CMS intended
to replace her position with a certified social worker, so the
letter's failure to spell out the school's employment
requirements for the new position is hardly surprising.  It
cannot be fairly characterized as "inconsistent and
contradictory," as Walker suggests.

Other inconsistencies that Walker points to are not
material, such as Wons's purported age-related animus.  Evidence
concerning Wons's purported biases is largely irrelevant because
Wons was not the decisionmaker.  The decision to terminate
Walker was made by Dr. Ryan.  Walker does not dispute that Ryan
made the decision but contends that Wons participated in the
termination by "provid[ing] a basis of termination in the letter
requested by Ryan."  Pl.'s Surreply in Opp. at 5.

As our court of appeals has held, "liability can attach
when a neutral decisionmaker 'relies on information that is
manipulated by another employee who harbors illegitimate
animus.'"  Ameen v. Amphenol Printed Cirs., Inc., 777 F.3d 63,
70 (1st Cir. 2015) (quoting Cariglia v. Hertz Equip. Rental
Corp., 363 F.3d 77, 86–87 (1st Cir. 2004)) (holding that an
employee's supervisor's animus could be imputed to the
decisionmaker).  That theory of liability in discrimination
cases is popularly known as the "cat's paw" theory.  To the
extent Walker is relying upon it, she falls short.  When Wons
provided Ryan with the information regarding Walker's personnel
issues in September, 2018, the decision to eliminate Walker's
position had already been made.  As Ryan described a late
summer, 2018, meeting between himself and Asbell:

> We started talking about services at the middle school
> and the high school.  And it was clear – well, we
> believed it was clear – and it was related to me from
> Jaime Sawler, who is the director of school
> counseling, and Ms. Asbell that moving to a model of a
> certified school social worker was probably our next
> step.  And the existence of the student assistance
> counsellor position would be transformed or eliminated
> and moved into – and replaced with the certified
> school social worker position.  So knowing that we
> were working within a budget and needing to eliminate
> a position to add a position, the student assistance
> counsellor position had been looked at for that even
> prior to my arrival.  So that's where the conversation
> started.
>                       . . .
>
> [We] looked at the organization of the district and
> the needs that were arising at the middle school, it

20

> was certainly the direction we wanted to move in.  Ms.
> Asbell had shared that information about the certified
> school social worker position.  It had been discussed
> with counsellors at the middle and high school, as
> well as the principals.  And so we would most likely
> be moving in the direction of – or, actually, we made
> the decision we were moving in the direction of a
> certified school social worker at the end of that
> year.  So that would have been the 2018-2019 year.

Defs.' Mot. for Summary Judgment, Exh. 5, Ryan Dep. 45:21-47:21.

The information that Wons (and Asbell) provided, which was not

age-related in any respect, simply led Ryan to expedite his

planned timeline for Walker's termination.  Walker's termination

was inevitable, in the sense that her position was going to be

eliminated at the end of the school year.  The personnel issues

that Wons raised were simply reasons to move more quickly; those

issues did lead Ryan to terminate Walker's contract earlier than

initially planned,[5] but those issues were all performance, or

attitude, or compatibility issues – none hints of age-based

animus.  Walker's age would not likely be a factor in Ryan's

decision to run out the contract term, or exercise the

---

[5]    Walker also fails to sufficiently establish that Ryan
"either [himself] had any improper motive, or that [he] knew or
reasonably should have known that [Wons] had an improper
motive." Ameen, 777 F.3d at 74 (Kayatta, J., concurring).  So,
even if Walker had evidence sufficient "to support a finding
that [Wons] was motivated to seek her discharge" for improper
reasons, there would still be no basis for holding the school
district vicariously liable.  Id. (comparing Velázquez–Pérez v.
Developers Diversified Realty Corp., 753 F.3d 265, 274 (1st Cir.
2014) (holding that an employer can be held liable for a co-
worker's discrimination under Title VII if, among other things,
the employer "knows or reasonably should know" of the
discrimination) (parentheses omitted)).

district's right to terminate early.  But friction or
difficulties in the workplace could.  This record does not hint
that age was a factor in Dr. Ryan's decision-making.

Walker next argues that pretext may be inferred from the
District's failure to consider whether she had the skillset and
requisite qualifications for the school social worker position.
She says the District knew (or should have known) that she had
been certified as a school social worker in the past, and could
easily be certified again.

"[A]n employer's misjudging of an employee's
qualifications, while not necessarily dispositive, may be
probative of whether the employer's reasons are pretexts for
discrimination."  Hodgens v. Gen. Dynamics Corp., 144 F.3d 151,
169 (1st Cir. 1998) (citations and quotations omitted).  See
also Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C.
Cir. 1996), as amended on denial of reh'g (July 15, 1996)
("Evidence indicating that an employer misjudged an employee's
performance or qualifications is, of course, relevant to the
question whether its stated reason is a pretext masking
prohibited discrimination; if the employer made an error too
obvious to be unintentional, perhaps it had an unlawful motive
for doing so.") (internal citation omitted)).  However, "an
employer is entitled to be wrong, provided it 'has an honest

belief in its proffered non-discriminatory reason for
discharging an employee.'"  Hopkins v. ADP, Inc., No. 12-CV-238-
SM, 2014 WL 2768655, at *5 (D.N.H. June 18, 2014) (quoting
Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117
(6th Cir. 2001)).  "To support an inference of pretext, to
suggest that something more nefarious might be at play, a
plaintiff must produce evidence that the employer did more than
get it wrong.  He or she must come forward with evidence that
the employer didn't really believe its proffered reasons for
action and thus may have been pursuing a hidden discriminatory
agenda."  Id. (quoting Johnson v. Weld County, Colo., 594 F.3d
1202, 1211 (10th Cir. 2010)).

     The undisputed facts here resist the characterization
Walker suggests, i.e., that the District made an error that was
"too obvious to be unintentional," Fischbach, 86 F.3d at 1183,
when it failed to consider her for the new position.  Dr. Ryan
stated that he did not consider Walker because, based on his
review of the New Hampshire Department of Education's
credentialing website, he reasonably understood that Walker did
not hold the requisite MSW credentials.  See Defs.' Mot. for
Summary Judgment, Exh. 5, Ryan Dep. 49:15-50:14.  He testified:

     At the time, my understanding was that [Walker had no]
     background in the credentialing process for a school
     social worker.  And we were going to move forward with
     posting the position in the spring that she certainly

could have applied for, but . . . I was not inclined
to ask her to transition into that position.

Id. at 50:23-51:6.  Even assuming that Ryan was mistaken in his

assessment of Walker's credentials – that is, had Walker renewed

her certificate, she would be permitted under state regulations

to perform as a school social worker — Walker has not

demonstrated that Ryan's mistake was so obvious an error that it

must have been intentional, or, really, that Ryan's mistake

constituted anything other than an honest misinterpretation of

Walker's qualifications.  When Dr. Ryan was replacing the

counseling position with the social worker position, the

Department of Education did, facially, require a school social

worker to have an MSW degree – the grandfathering exception was

not obvious.


    Finally, and critically, Walker has not identified

compelling, admissible evidence that links her age to the

decision to eliminate her position.  In other words, Walker

fails to establish "that age was the 'but-for' cause of the

employer's adverse action."  Zampierollo-Rheinfeldt, 999 F.3d at

51 (quoting Vélez, 585 F.3d at 447-48 (further quotations

omitted)).  The bulk of the evidence Walker relies upon in

support of her claim relates to her contentions of pretext, not

to age.  See Mesnick, 950 F.2d at 826 ("the vast majority of

Mesnick's evidence related to pretext vel non.  Regardless of

its bulk, this evidence had nothing at all to do with age or
with the employer's true motives.").

     The only evidence Walker offers that arguably relates to
her age is defendants' use of the word "contemporary" in the
October, 2018, letter to parents announcing her departure.  As
discussed earlier, the October, 2018, letter read: "[W]e have
come to understand that we must begin addressing the needs of
our students in a more contemporary fashion."  Defendants urge
that their use of the word "contemporary" should be categorized
as a mere "stray remark," see defs.' mem. in supp. of summary
judgment at 19, no doubt because our Court of Appeals has noted
that "stray workplace remarks, as well as statements made either
by nondecisionmakers or by decisionmakers not involved in the
decisional process, normally are insufficient, standing alone,
to establish either pretext or the requisite discriminatory
animus."  Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir.
2002).  But, given the context in which the word was used – in a
letter from the defendants announcing Walker's departure, and
explaining the District's decisional process – it cannot fairly
be categorized as merely a "stray remark."  See Straughn v.
Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001)
("statements directly related to the challenged employment
action may be highly probative in the pretext inquiry").

However, "it is far from clear that the alleged remark[]
bespeak[s] any age-based animus at all." Gonzalez, 304 F.3d at
69 (citing Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572,
583 (1st Cir. 1999) abrogated on other grounds by Desert Palace,
Inc. v. Costa, 539 U.S. 90, 101–102 (2003) ("a statement that
plausibly can be interpreted two different ways — one
discriminatory and the other benign — does not directly reflect
illegal animus")) (further citations omitted)).  As defendants
point out, the word "contemporary" was used in the letter to
"describe the District's approach to dealing with the students'
social and emotional wellness" by employing a social worker
instead of a student assistance counselor, an approach that was
new to CMS.  Defs.' Mem. in Supp. of Summary Judgment at 18.
The letter was not likely commenting on Walker's age, and it is
doubtful that parental readers would have thought that single
descriptor was meant as a code for "Walker was let go because
she was too old."  Instead, the letter was both announcing
Walker's departure, and the planned modification to the school's
wellness program.  Walker conceded that she read the letter as
suggesting that her approach to wellness was outdated, which led
her to believe that it was referencing her age.  Pl.'s Opp. to
Summary Judgment, Exh. 2, Walker Dep. 43:10-13 ("I believe it
implies that what I was supplying [students] was old-fashioned,
outdated, and I think it was a reference to how long I'd been
around, what my age was.").  Even assuming that use of the word

"contemporary" was intended as a slight to Walker's "outdated"
approach to working with students, it can be taken only as that,
a slight to Walker's approach to performing her job, but not
necessarily to her age.  See Hoffman v. MCA, Inc., 144 F.3d
1117, 1122 (7th Cir. 1998) (remarks that sales representative
was an "old-fashioned hack salesman" did not demonstrate
discriminatory intent because "they do not refer to the sales
representative's age — they refer to his style," and were "not
probative of intent to discriminate" based on age).

    In sum, and giving Walker every benefit of the doubt, the
comment was, at most, ambiguous.  And, "ambiguous remarks,
tending to suggest animus based on age, are insufficient,
standing alone, to prove an employer's discriminatory intent."
Speen v. Crown Clothing Corp., 102 F.3d 625, 636 (1st Cir. 1996)
(internal quotations omitted) (citations omitted).

    For all these reasons, no reasonable fact finder could
conclude on this record that defendants' use of the word
"contemporary" in their October, 2018, letter evinces age-based
discriminatory animus.

    Finally, Walker makes the argument that she was part of a
pattern of age-related discriminatory conduct by the school
district.  Her argument in that regard is largely undeveloped.

She says that ten of the 15 teachers or staff whose contracts were not renewed since 2015 were over the age of 40.  That may well be true, but the evidence she points to in support of her claims suggests that those employees resigned, which is why their contracts were not renewed.  See Pl.'s Opp. to Summary Judgment, Exh. 19, p. 5.  Moreover, Walker offers minimal information concerning these employees, beyond their ages, dates of hire, and positions.  Even if the court were to credit this evidence as suggesting defendants' animus against employees older than the age of 40, Walker has not presented evidence that would support an inference that defendants discriminated against her on the basis of age.  As our court of appeals has stated:

> In a disparate treatment case . . ., the central focus "is less whether a pattern of discrimination existed [at the company] and more how a particular individual was treated, and why." Cumpiano v. Banco Santander P.R., 902 F.2d 148, 156 (1st Cir. 1990).  As such, statistical evidence of a company's general hiring patterns, although relevant, carries less probative weight than it does in a disparate impact case.  See id.; Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 184 n. 3 (1st Cir. 1989) (questioning how statistics showing a low percentage of African Americans and women at A & P would have been admissible in a disparate treatment case).  In this context, statistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee.  See Walther v. Lone Star Gas Co., 977 F.2d 161, 162 (5th Cir. 1992).  This is because a company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual.  Gadson v. Concord Hosp., 966 F.2d 32, 35 (1st Cir. 1992).  "Without an indication of a

28

connection between the statistics," the practices of
the employer, and the employee's case, statistics
alone are likely to be inadequate to show that the
employer's decision to discharge the employee was
impermissibly based on age.  Id.

LeBlanc, 6 F.3d at 848.[6]


As the Court of Appeals for the Eleventh Circuit has
stated, an "employer may fire an employee for a good reason, a
bad reason, a reason based on erroneous facts, or for no reason
at all, as long as its action is not for a discriminatory
reason."  Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187
(11th Cir. 1984), abrogated on other grounds by Lewis v. City of
Union City, Georgia, 918 F.3d 1213 (11th Cir. 2019).  See also
Mesnick, 950 F.2d at 825 ("The ADEA does not stop a company from
discharging an employee for any reason (fair or unfair) or for
no reason, so long as the decision to fire does not stem from

---

[6]     Although she did not assert a disparate impact claim,
Walker makes an undeveloped and unsupported argument that the
defendants' "policy decision to eliminate her position" was
evidence of age bias, and constituted "disparate impact age
discrimination."  Pl.'s Mem. in Supp. of Opp. at 9-10.  Because
plaintiff did not assert a disparate impact claim, the court
will not address Walker's argument.  See Rodriguez v. Doral
Mortg. Corp., 57 F.3d 1168, 1171 (1st Cir. 1995) ("while courts
should construe pleadings generously, paying more attention to
substance than to form, they must always exhibit awareness of
the defendant's inalienable right to know in advance the nature
of the cause of action being asserted against him.  A
fundamental purpose of pleadings under the Federal Rules of
Civil Procedure is to afford the opposing party fair notice of
the claims asserted against him and the grounds on which those
claims rest.") (internal citations omitted).

the person's age.  Courts may not sit as super personnel
departments, assessing the merits - or even the rationality - of
employers' nondiscriminatory business decisions.) (internal
quotations and citations omitted).  Based upon this record, a
reasonable trier of fact could not, as a matter of law, conclude
that Walker was the victim of unlawful age-based discrimination
by the defendants.  Because Walker has not set forth evidence
sufficient to convince a reasonable juror that defendants
violated the ADEA, defendants are entitled to summary judgment
on Walker's ADEA claim.


    2.   Supplemental Jurisdiction

Having concluded that defendants are entitled to judgment
as a matter of law on Walker's federal claim, the court must
determine whether it is appropriate to exercise supplemental
jurisdiction over her remaining state law claims.  <u>See</u> generally
28 U.S.C. § 1367.


Section 1367 provides that the court may decline to
exercise supplemental jurisdiction over a plaintiff's state law
claim when:

      (1)   the claim raises a novel or complex issue of State
           law,

      (2)   the claim substantially predominates over the claim or
           claims over which the district court has original
           jurisdiction,

(3)    the district court has dismissed all claims over which
       it has original jurisdiction, or

(4)    in exceptional circumstances, there are other
       compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied).  To assist district

courts, the Court of Appeals for the First Circuit has

identified the following additional factors that should be

considered when determining whether to exercise supplemental

jurisdiction over state law claims: (1) the interests of

fairness; (2) judicial economy; (3) convenience; and (4) comity.

See Camelio v. American Fed'n, 137 F.3d 666, 672 (1st Cir.

1998).  And, with regard to principles of fairness and comity,

the Supreme Court has observed:

> Needless decisions of state law should be avoided both
> as a matter of comity and to promote justice between
> the parties, by procuring for them a surer-footed
> reading of applicable law.  Certainly, if the federal
> claims are dismissed before trial, even though not
> insubstantial in a jurisdictional sense, the state
> claims should be dismissed as well.

United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) (footnote

omitted).  See also Carnegie-Mellon Univ. v. Cohill, 484 U.S.

343, 350 n.7 (1988) ("[I]n the usual case in which all federal-

law claims are eliminated before trial, the balance of factors

to be considered under the pendent jurisdiction doctrine —

judicial economy, convenience, fairness, and comity — will point

toward declining to exercise jurisdiction over the remaining

state-law claims."); Rivera-Diaz v. Humana Ins. of P.R., 748 F.3d 387, 392 (1st Cir. 2014) (upholding district court's decision declining to exercise supplemental jurisdiction).

Given that the federal claim in Walker's complaint is resolved, and taking into account the factors identified in Camelio, the court declines to exercise supplemental jurisdiction over Walker's state law claim.

## CONCLUSION

For the foregoing reasons, as well as those set forth in defendants' memoranda, defendants' motion for summary judgment (docket no. 10) is granted in part.  Judgment shall be entered in favor of the defendants on count one.  The court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claim, which is dismissed without prejudice.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

November 1, 2021

cc:  Counsel of Record